ASSOCIATION AGAINST DISCRIMINATION IN EMPLOYMENT et al., Plaintiffs-Appellees-Cross-Appellants,

v.

CITY OF BRIDGEPORT et al., Defendants-Appellants,

and

Bridgeport Firefighters for Merit Employment, et al., Intervening Defendants-Appellants.

Nos. 413, 414 and 595, Dockets 78–7400, 78–7406 and 78–7431.

United States Court of Appeals, Second Circuit.

Argued Dec. 18, 1978.

Decided Feb. 23, 1979.

actually was caused by the denial. *Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

Raymond B. Rubens, Bridgeport, Conn., for defendants-appellants City of Bridgeport, et al.

J. Daniel Sagarin, Bridgeport, Conn. (Sagarin & Rutkin, Bridgeport, Conn., of counsel), for intervening defendants-appellants Bridgeport Firefighters for Merit Employment, Inc., et al.

David N. Rosen, New Haven, Conn. (Michael P. Koskoff, Bridgeport, Conn., of counsel), for plaintiffs-appellees-cross-appellants Association Against Discrimination in Employment, et al.

Before FEINBERG, MULLIGAN and GURFEIN, Circuit Judges.

FEINBERG, Circuit Judge:

This appeal arises out of a Title VII class action in the United States District Court for the District of Connecticut, brought by 10 black and hispanic applicants to the Bridgeport Fire Department, and by an organization representing plaintiffs' interests, against various municipal officials and agencies and the City of Bridgeport.[1] In the district court, several incumbent white firefighters and an organization they had formed in response to the action were allowed to intervene as defendants. Defendants and the intervenors appeal from an order of Judge T. F. Gilroy Daly that invalidated an examination for the job of firefighter, enjoined defendants from using that test, and directed them to hire minority applicants for that job in ratios and under conditions specified in the order. The judge's two opinions, one dealing with liability and the other with remedy, are reported at 454 F.Supp. 751, 758. Plaintiffs cross-appeal, complaining of the judge's order in various respects. For reasons set forth below, we remand the case to the district court for further consideration in accordance with this opinion.

1. The officials named as defendants, individually and in their official capacities, are the members of the Bridgeport Civil Service Commission, the Director of the Civil Service Commission, the members of the Bridgeport Board of Fire Commissioners, and the Fire Chief and Mayor of Bridgeport.

## I.

In February 1972, members of the Bridgeport Civil Service Commission, as is the case here, were sued in an action under 42 U.S.C. §§ 1981 and 1983 by black and Puerto Rican applicants for positions in the Bridgeport Police Department, who claimed that the Department's employment policies discriminated against them.[2] In March 1972, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., became applicable for the first time to states and political subdivisions as employers.[3] Perhaps motivated by these two events at least in part, the City of Bridgeport joined in March 1972 with 10 other Connecticut municipalities to hire a supposedly expert firm to develop a racially unbiased examination for the position of firefighter. Such action was well advised in view of the lack of blacks and hispanics in the Fire Department. In 1975 when these groups comprised about 41 percent of Bridgeport's labor force, its Fire Department had 427 whites, one hispanic and no blacks. No manner of legal argument can justify this unpleasant fact. From 1972 to 1975, while the new test was being developed, defendants gave no tests and hired only 28 white firefighters from a 1971 list, apparently now discredited. In March 1975, the new test was administered to over 700 people, and defendants created a list of almost 200 successful applicants ranked in order. Only eight minority applicants were on the list.

In September 1975, plaintiffs filed the complaint in this case alleging that the discriminatory hiring and promotion practices of the Bridgeport Fire Department violated Title VII.[4] The intervening defendants were allowed in the litigation in July 1976. Shortly thereafter, when the City indicated that it wanted to begin hiring firefighters from the 1975 list, plaintiffs moved for a preliminary injunction, challenging the 1975 test as discriminatory. After a chambers conference before Judge Jon O. Newman, all the parties consented to an order which allowed defendants to fill one-half of the then current vacancies, and the City hired 40 firefighters from the list. In June 1977, the parties consented before Judge Robert C. Zampano to a similar order, which authorized the hiring of 44 more firefighters.

In October 1977, plaintiffs were certified as representatives of the class of all black and hispanic victims of defendants' alleged employment discrimination. Thereafter, Judge Daly conducted an 11-day nonjury trial on the issues of liability, at which a number of expert witnesses testified. In July 1978, the judge ruled in favor of plaintiffs. 454 F.Supp. 751. The judge noted that plaintiffs could prove a prima facie violation of Title VII by showing either that defendants had intentionally treated minorities differently or that the 1975 test had a disparate impact on them. See, e. g., *Furnco Construction Corp. v. Waters,* —— U.S. ——, 98 S.Ct. 2943, 2952–53, 57 L.Ed.2d 957 (1978) (Marshall, J., concurring and dissenting); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–36 n.15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The judge found for plaintiffs on the latter theory relying on the following data:

> [A]t the time the firefighters exam was given, minorities constituted 41% of Bridgeport's population, but only 0.2% of its Fire Department.
>
> The firefighters exam did little to alter this imbalance. . . . In terms of the pass rate, minority candidates passed with one-third the frequency of nonminority candidates; a 9% minority pass rate as compared with a 27% nonminority pass rate.

---

2. See *Bridgeport Guardians, Inc. v. Bridgeport Civil Service Comm'n,* 482 F.2d 1333 (2d Cir. 1973), cert. denied, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975). See also *Bridgeport Guardians v. Bridgeport Police Dep't,* 431 F.Supp. 931 (D.Conn.1977); *Armeno v. Bridgeport Civil Service Comm'n,* 446 F.Supp. 553 (D.Conn.1978).

3. Equal Opportunity Act of 1972, Pub.L.No.92–261, 86 Stat. 103 (March 24, 1972).

4. Plaintiffs also asserted claims under 42 U.S.C. §§ 1981 and 1983 but later withdrew them.

454 F.Supp. at 754. Since disparate impact was shown, the judge held that defendants had the burden of proving that the 1975 test was substantially job related. See *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Vulcan Society v. Civil Service Commission,* 490 F.2d 387, 393 (2d Cir. 1973). Judge Daly found that defendants did not meet this burden, because of deficiencies in preparation of the test and in selection of the passing score. The judge also noted that defendants' efforts to recruit minorities to take the examination had been unsatisfactory, although he observed that

> there appears to be no bad faith on the part of defendants in using the exam or in selecting [a] respected management consulting firm . . . to develop the exam. Defendants made a substantial effort to obtain an exam that would withstand judicial scrutiny.

454 F.Supp., at 757. Since the judge found for plaintiffs on the theory of disparate impact, he did not reach any claim of intentional discrimination.

After a one-day hearing devoted to remedy issues, the judge issued a "Remedy Order," which granted sweeping affirmative relief, including hiring quotas. 454 F.Supp. 758. In addition to declaring the 1975 test invalid and enjoining its use in the future, the judge ordered that the City immediately hire all blacks and hispanics who had filed applications to take the 1975 exam, if they met physical, residency and other objective requirements. Hiring of only minority applicants would continue until the number hired since 1975 equalled the number of whites hired since 1975. Thereafter, white and minority applicants would be hired on a 1:1 ratio until the number of

minority firefighters in the Department totalled 125.[5] These provisions were incorporated into an order, dated August 4, 1978, which is the subject of the appeal and cross-appeal now before us.[6]

## II.

On the main appeal, defendants first strenuously urge that the district judge erred in finding the 1975 test discriminatory.[7] Defendants claim that the judge misconstrued the burden of persuasion that they had to meet, that the judge improperly adopted as a matter of law a theory of employment testing that had been justifiably rejected by the consulting firm, and that defendants' selection of an appropriate employment test was an administrative decision that cannot be overturned if there is substantial evidence to support it. With regard to the remedy provisions, defendants particularly attack the imposition of a quota, which they contend is unconstitutional, barred by section 703(j) of Title VII, 42 U.S.C. § 2000e–2(j), and unwarranted on the facts of this case. Plaintiffs rejoin in kind, arguing that the judge applied proper legal standards in determining the unlawfulness of the 1975 test, that his factual findings were not clearly erroneous, that the hiring quota was an appropriate, indeed moderate, exercise of discretion, and that the provision for monetary relief did not go far enough.[8]

Included in these contending arguments are issues of the gravest kind, which have been the subject of intensive scrutiny in this and in other courts, and have not yet been definitively decided at the highest level. See, e. g., *Regents of the University of*

---

5. The order also included provisions regarding promotion, retroactive seniority, back pay and attorneys' fees.

6. The judgment was stayed by another panel of this court in November 1978.

7. Hereafter, unless otherwise indicated, we will use defendants to refer to both appellants and to the intervenors, Bridgeport Firefighters for Merit Employment, Inc., et al.

8. Plaintiffs on cross-appeal argue that the court erred in limiting back pay to those minority persons who actually applied to take the 1975 exam and are appointed pursuant to the court's order, and in excluding those who took the exam in 1975 but no longer desire appointment or no longer meet the prerequisites for appointment and those who were deterred from applying by defendants' past discriminatory practices, see *Int'l Bhd. of Teamsters v. United States, supra,* 431 U.S. at 364–71, 97 S.Ct. 1843.

*California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). See also *Davis v. County of Los Angeles,* 566 F.2d 1334 (9th Cir. 1977), cert. granted, 437 U.S. 902, 98 S.Ct. 3087, 57 L.Ed.2d 1132 (June 19, 1978) (argued Dec. 5, 1978, see 47 U.S.L.W. 3406); *Weber v. Kaiser Aluminum & Chemical Corp.,* 563 F.2d 216 (5th Cir. 1977), cert. granted, —— U.S. ——, 99 S.Ct. 608, 58 L.Ed.2d 676 (1978). We recognize, however, our obligation to resolve these questions as best we can, guided by the decisions to date in the Supreme Court and by our own precedents. However, the state of the record as it comes to us in this case gives us pause, for the following reasons:

1. In his brief memorandum "Remedy Order," issued after a short hearing on remedy issues, the district judge did not refer to any of this court's recent decisions dealing with quotas, e. g., *EEOC v. Local 638,* 565 F.2d 31 (1977); *EEOC v. Local 14, International Union of Operating Engineers,* 553 F.2d 251 (1977); *Chance v. Board of Examiners,* 534 F.2d 993 (1976), cert. denied, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977); *EEOC v. Local 638,* 532 F.2d 821 (1976); *Kirkland v. New York State Department of Correctional Services,* 520 F.2d 420, rehearing en banc denied, 531 F.2d 5 (1975), cert. denied, 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976); *Patterson v. Newspaper & Mail Deliverers' Union,* 514 F.2d 767 (1975), cert. denied, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976); *Rios*

*v. Enterprise Association Steamfitters Local 638,* 501 F.2d 622 (1974); *Vulcan Society v. Civil Service Commission,* 490 F.2d 387 (1973); *Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission,* 482 F.2d 1333 (1973), cert. denied, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975); *United States v. Wood, Wire & Metal Lathers International Union, Local 46,* 471 F.2d 408, cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973). These cases have been the occasion for some strong differences of opinion, reflecting in large part the conflicting views also held in other courts [9] and indeed, in the nation as a whole on the propriety of quota relief. Looking to the decisions of our own court, it is reasonably clear that for some of its members quota relief can constitutionally be justified only if necessary to redress "a clear-cut pattern of long-continued and egregious racial discrimination," and if the reverse discriminatory effects of the quota do not fall upon "a small number of readily identifiable" non-minority persons. *Kirkland v. New York State Department of Correctional Services, supra,* 520 F.2d at 427, 429. See also *EEOC v. Local 638, supra,* 532 F.2d at 828. We do not suggest that these conditions on imposition of quotas reflect the views of all members of the court, see *Kirkland v. New York State Department of Correctional Services, supra,* 531 F.2d 5 (Mansfield, J., dissenting from denial of rehearing en banc, joined by Kaufman, C. J., and Oakes, J.), or even of all members of this panel,[10] but the deci-

9. Compare, e. g., *Boston Chapter, NAACP, Inc. v. Beecher,* 504 F.2d 1017, 1026–28 (1st Cir. 1974), cert. denied, 421 U.S. 910, 95 S.Ct. 1561, 43 S.Ct.2d 775 (1975); *Contractors Association v. Secretary of Labor,* 442 F.2d 159, 171–74, 176–77 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); *Morrow v. Dillard,* 580 F.2d 1284, 1291–96 (5th Cir. 1978); *Morrow v. Crisler,* 491 F.2d 1053 (5th Cir.) (en banc), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed. 139 (1974); *United States v. Local 212, IBEW,* 472 F.2d 634 (6th Cir. 1973); *United States v. City of Chicago,* 549 F.2d 415, 436–37 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); *Carter v. Gallagher,* 452 F.2d 315, 327 (8th Cir.) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); *United States v. Ironworkers Local*

86, 443 F.2d 544, 552–54 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971) with, e. g., *Oburn v. Shapp,* 521 F.2d 142, 150 n. 20 (3d Cir. 1975); *Sledge v. J. P. Stevens & Co.,* 585 F.2d 625, 644–50 (4th Cir. 1978); *Morrow v. Crisler, supra,* 491 F.2d at 1058 (Clark, J., concurring), id. at 1060 (Roney, J., joined by Bell & Ainsworth, JJ., concurring specially), id. at 1061 (Coleman, J., dissenting), id. at 1064 (Gee, J., concurring in part and dissenting in part); *Carter v. Gallagher,* 452 F.2d 315 (8th Cir. 1971) (original panel decision), modified, 452 F.2d 327. See also *Hull v. Cason,* 151 Cal.Rptr. 438 (Calif.Ct.App.1978); *Hiatt v. City of Berkeley,* 149 Cal.Rptr. 155 (Ct.App.1978).

10. See *EEOC v. Local 638, supra,* 532 F.2d at 833–34 (Feinberg, J., concurring); *Patterson v.*

sions cited above indicate that these views command considerable support.

██ Defendants characterize the district judge's order here as granting "the broadest quota hiring remedy . . . . in any municipal employment testing case, including those in which there had been findings of intentional discrimination." [11] Whether or not this statement is accurate, the quota relief here is very broad, and before imposing it the district judge should expressly consider the relevant authorities and either make appropriate findings or state why he believes they are not necessary. The findings might include, e. g., whether the court is relying on discrimination between 1972 and 1975 or prior to 1972, and, if so, on what theories, see, e. g., *Hazelwood School District v. United States,* 433 U.S. 299, 309 & n. 15, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *United Airlines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *International Brotherhood of Teamsters v. United States, supra,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396, and why the quota required the hiring of minorities and non-minorities in approximately a 1:1 ratio when minorities constituted only roughly 11 percent of those who took the test. See *EEOC v. Local 14, supra,* 553 F.2d at 256–57; *Vulcan Society v. Civil Service Commission, supra,* 490 F.2d at 398–99. The district court also should take into account, to the extent relevant, cases of this circuit decided since its original order. See, e. g., *Fullilove v. Kreps,* 584 F.2d 600, 606–09 (2d Cir. 1978); *Prate v. Freedman,* 583 F.2d 42 (2d Cir. 1978).

2. During the course of this litigation, the district court, as outlined above, twice authorized defendants to hire firefighters from the list resulting from the 1975 test. The first time, the order of Judge Newman provided, in relevant part:

[T]he defendants may make at any time appointments to the Bridgeport Fire Department of a number of firefighters equal to one-half the number for which the city warrants there is and will remain an immediate need and adequate funding. In the event the Court should order a hiring plan, these appointments will be counted as part of such plan.

Pursuant to this order, defendants hired 40 firefighters from the 1975 list. Under a similar arrangement, almost a year later, defendants hired 44 more firefighters from the list. Only three of these 84 positions went to black or hispanic applicants.

It is apparent that these hirings represented a partial compromise of contending views to meet the City's pressing need for firefighters, a sensible attempt at accommodation under the circumstances. But the implications of such an agreement are unclear. The 84 firefighters thus employed apparently received permanent, not temporary, appointments. Were that not so, the district judge probably could have remedied the allegedly discriminatory test results by ordering the prompt preparation (in consultation with representatives of plaintiffs) [12] of a properly job-related test [13] and more

---

*Newspaper & Mail Deliverers' Union, supra,* 514 F.2d at 775 (Feinberg, J., concurring).

11. Brief for Intervenors at 26.

12. See *Chance v. Board of Education,* 496 F.2d 820, 823 (2d Cir. 1974); *Chance v. Board of Examiners,* 458 F.2d 1167, 1179 & n. 23 (2d Cir. 1972).

13. We agree with the judge's observation:
The Court also finds it peculiar that exams, such as the firefighters exam, tend to place so little emphasis on physical ability. It would seem that the physical ability necessary for a qualified firefighter is neither more

difficult to identify nor more complicated to measure than the intelligence level of a qualified firefighter.

454 F.Supp. at 758 n. 8. See also *Vulcan Soc'y v. Civil Serv. Comm'n, supra,* 490 F.2d at 397–98.

Plaintiffs have suggested that merely giving a new nondiscriminatory exam, even with active recruitment of minority applicants, is inadequate to overcome a long history of notorious discriminatory hiring policies and quota relief is necessary to assure prospective minority candidates that applying is no longer futile. We express no view on this theory since it is unclear whether the district court made such a finding.

energetic recruitment of minority applicants to take it, and by then filling all jobs—including the 84 just referred to—in a nondiscriminatory fashion. While this course is still a possibility,[14] we recognize that conversion of court-supervised hirings from permanent to temporary would destroy legitimately held expectations. On the other hand, the district judge pointed out that

> these men [the 84 already hired] have not demonstrated that they are intellectually more qualified to be firefighters than the applicants who failed. Moreover, since testimony at the remedy hearing indicated that these eighty-four men are performing their duties adequately, it is fair to assume that all of the applicants who are able to pass the same agility test and medical examination will be capable of performing at least as well as the eighty-four men already hired.

454 F.Supp. at 759.

■ This observation, coupled with the prior two compromise agreements for hiring, raises the question whether it can fairly be said that in return for such job protection for the 84 firefighters already hired, all parties impliedly agreed that if the test were held invalid, 84 blacks and hispanics could then be ordered hired. Indeed, plaintiffs make precisely that argument to us.[15] Such a quota, imposed as part of a court-supervised settlement, would be subject to unique considerations. Cf. *Prate v. Freedman, supra,* 583 F.2d at 47; *Patterson v. Newspaper & Mail Deliverers' Union, supra,* 514 F.2d 767; *Weber v. Kaiser Aluminum & Chemical Corp., supra,* 563 F.2d 216. Conversely, the intervenors argue that plaintiffs might have attempted to enjoin preliminarily any use of the 1975 test but chose to avoid an early hearing and agreed to immediate appointment of some firefighters (including three minority group members) in exchange for guaranteed funding for positions which might, but not necessarily would, be assigned to minority group members.[16] The implications of this view are not helpful to plaintiffs. In any event, the district court did not explicitly consider all the implications of the two prior hiring orders,[17] and should do so in the first instance.

3. Finally, we turn to an equally troubling issue that directly affects not only the remedy ordered by the judge, but also the basic finding of liability. The district court stated that "the ultimate effect of the exam turns upon the score used to differentiate between passing and failing" and that this "critical choice" had to be "scrutinized with particular care" because this decision was partly responsible for the disparate impact of the exam. All those who scored in or above the 75th percentile of those taking the exam passed. The passing score was 12. The judge then determined that the "only explanation" for the passing score of the 75th percentile was "the arbitrary requirement of Bridgeport's City Charter" that candidates "answer correctly at least 75% of all questions on civil service exams." 454 F.Supp. at 756–57 & n. 6. The judge correctly characterized application of this requirement to the firefighter exam as bearing "no relation" to job proficiency,[18] partic-

---

14. Unexpectedly, the City apparently suggests retesting all the 1975 applicants, including those now on the job, if we affirm the invalidation of the 1975 list, Brief for City of Bridgeport at 11, 13, but plaintiffs reject the notion, Brief for Appellees at 59 n. 39. We note that such a procedure might perpetuate the effects of the 1975 discriminatory examination, since presumably the 84 candidates who have gained on-the-job experience would have an advantage on any job-related test.

15. Brief for Appellees at 41.

16. Brief for Intervenors at 54–55.

17. The City argues that it never would have hired the 84 firefighters who passed the 1975 test if it had known that this would make it liable for a potentially bankrupting back pay award to 84 minority firefighters who were not hired. Brief for City of Bridgeport at 16–17.

18. In fact, the passing score bore no relation to the City Charter's requirement, since the percentile score indicates only how well an applicant did in relation to other candidates, and not the number of questions answered correctly. 454 F.Supp. at 756–57 n. 6.

ularly since the consultant firm that prepared the exam did not recommend a passing score. Indeed, defendants conceded in the district court that the test was not scored properly and urged the judge to lower the passing score, which would also have eliminated most of the disparate effect of the exam. The district court dealt with this contention as follows:

> The discriminatory impact of the exam would have been significantly alleviated if the passing score had been designated as 6. If this score had been used, 55.2% of the Blacks and 68.6% of the Whites would have passed. Plaintiffs contend that even with such an alteration of the passing score, the exam would be discriminatory because only 9.2% of the total number of candidates to pass would be members of minority groups. The force of this contention is weakened by the fact that only 10.9% of those who applied to take the firefighters exam were members of minority groups.

454 F.Supp. at 756 n. 5.

■ Defendants repeat to us their offer to lower the passing score, stressing that the district court found that the City had made a good faith effort to develop a job-related test, that a lower passing score would eliminate the disparate impact, and that there was substantial evidence that such a passing score was justifiable. A cut-off score of six would apparently qualify approximately 50 identified blacks and hispanics as well as over 300 whites and some 70 racially unidentified persons, and the effectiveness of the list could be continued, by order of the court, until all passing candidates have been hired.[19] We do not regard this as a frivolous argument. The principal, although not the only, basis of the district court's finding of violation of Title VII was the disparate impact of the test at the arbitrary 75th percentile passing score, and we do not find the district judge's response to the City's argument, quoted above, thoroughly convincing. It may be that if the passing mark had originally been six, there would have been no showing of disparate impact in the first place and that, hence, there would have been no ground for deciding whether the test was job-related. See *Albemarle Power Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). The percentage of identified blacks and hispanics who would then have passed the examination (about 50 in number) would be much closer to the percentage of whites passing than was the case with the 75th percentile passing score.[20] That would not be the end perhaps because, while the earlier history of discrimination before 1972 would not be controlling in this Title VII case, see text following note 11 *supra*, the use of a ranking rather than a qualifying examination could nevertheless still be argued as having had a disparate impact.

**19.** Defendants make clear they would not object to such an extension of the life of the list past the two years provided by law. However, plaintiffs argue that since there would still be fewer positions available in the Fire Department than the number of applicants who scored six or above, many would still have a long wait. They further point out that if applicants were hired in order of rankings from the exam, minority candidates generally would be hired later, and thus the exam would have a significant discriminatory impact even though lowering the score closes up the discrepancy in passing rates. However, this effect could be eliminated by random selection of appointees from the group of passing candidates, rather than use of rankings.

**20.** Plaintiffs argue that even a passing score of six still would result in a discriminatory impact in the passing rates. We do not express an opinion on this issue, but merely suggest that the district court might want to explore further the implications of lowering the passing score.

Plaintiffs also point out that lowering the passing score was suggested as a remedy, not as a defense to liability. We have found no authority on whether an employer who selects a cut-off score and defends it until the test has been found not job-related can then avoid the implications of that finding by adjusting the passing score to a point where the disparate impact is arguably insignificant.

See note 19 *supra.* The problem is complicated moreover by the earlier hiring of 84 whites and three minority persons under an ambiguous interim agreement. It may be that some plan which accepts the reduction of the passing mark to six and treats the list as a qualifying list without ranking, subject to passing physical and medical examinations, would, as an interim measure, afford substantial minority representation and be acceptable as part of an overall settlement that the parties may still discover to be the most sensible course of all.

In conclusion, we vacate the order appealed from and remand the case to the district court for further consideration of the matters discussed in this opinion.