ASSOCIATION AGAINST DISCRIMINATION IN EMPLOYMENT, INC. et al., Plaintiffs,

v.

The CITY OF BRIDGEPORT et al., Defendants.

Civ. No. B–75–268.

United States District Court,
D. Connecticut.

Aug. 24, 1979.

---

David N. Rosen, New Haven, Conn., Michael P. Koskoff, Bridgeport, Conn., for plaintiffs.

Raymond B. Rubens, Bridgeport, Conn., for defendants.

J. Daniel Sagarin, Bridgeport, Conn., for intervenors.

Steven Rosenbaum, Civil Rights Div., U.S. Dept. of Justice, amicus curiae, for United States.

## MEMORANDUM OF DECISION

DALY, District Judge.

This employment discrimination case is before this Court on remand from the Court of Appeals. *See Association Against Discrimination in Employment v. City of Bridgeport*, 594 F.2d 306 (2d Cir. 1979).[1] The named plaintiffs represent the class of all black and hispanic persons who are alleged victims of the City of Bridgeport's allegedly discriminatory employment practices with respect to hiring in the Bridgeport Fire Department. The defendants are the City of Bridgeport and its Civil Service Commission, Board of Fire Commissioners, Fire Chief Engineer, and Mayor. A group of Bridgeport's firefighters, Bridgeport Firefighters for Merit Employment, Inc., has been permitted to intervene as defendants-intervenors. Subsequent to the remand by the Court of Appeals, the United States was given leave to participate as *amicus curiae*.

Plaintiffs allege that defendants have engaged in a policy and practice of discriminating on the basis of race, color, and/or national origin with respect to entry-level employment in the Bridgeport Fire Department, in violation of Title VII of the Civil Rights Act of 1964, as amended 1972, 42 U.S.C. § 2000e *et seq.* (1970 ed. and Supp. V); Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (1970 ed. and Supp. V); and § 122(a) of the Revenue Sharing Act, 31 U.S.C. § 1242(a) (1976 ed.).[2]

## LIABILITY

*Title VII*

### I.

The credible evidence in this case establishes that the City of Bridgeport has a long history of and strong reputation for discriminating against black and hispanic persons in its hiring of firefighters. The City has engaged in a continuing pattern and practice of post-Title VII discrimination, that is discrimination occurring since March 24, 1972, against black and hispanic persons by: (1) failing properly to recruit minority applicants, (2) actively deterring minority

---

1. This Court's prior decisions concerning liability and the appropriate remedy are reported at 454 F.Supp. 751 (D.Conn.1978) and 454 F.Supp. 758 (D.Conn.1978), respectively.

2. While the Court's prior decision concerning liability, *see* n. 1, *supra*, dealt primarily with the question whether the 1975 firefighters exam violated Title VII on a disparate impact theory, nothing in that opinion or in the decision of the Court of Appeals limited the scope of the matters otherwise properly before this Court. The EEOC complaints on which this action is founded contain sufficient allegations to place before this Court the issue of whether defendants have violated Titles VI or VII or the Revenue Sharing Act by engaging in a continuing policy and practice of discriminating against black and hispanic persons in entry-level hiring of firefighters. *Cf. Silver v. Mahasco Corp.*, 602 F.2d 1083 (2d Cir. 1979). "A continuously maintained illegal employment policy may be the subject of a valid complaint until a specified number of days after the *last occurrence* of an instance of that policy." *Acha v. Beame*, 570 F.2d 57, 65 (2d Cir. 1978) (emphasis in original). The question of the scope of this case was raised at the outset of trial when defendants' and intervenors' objections to the introduction of evidence relating to matters other than the 1975 test were overruled. (Tr. at 3–6). Since at least that time, all counsel have had explicit notice that the scope of this case extended beyond the question of whether defendants violated Title VII by hiring on the basis of the 1975 test.

persons who have sought to become fire-fighters, and (3) hiring firefighters on the basis of discriminatory qualifying examinations.

■ The defendants may be held liable under Title VII only for discrimination occurring after March 24, 1972, the date on which the Act became applicable to municipal employers. *Hazelwood School District v. United States*, 433 U.S. 299, 309, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 356–57, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). A history of pre-Act discrimination, however, may be used as a backdrop against which to evaluate post-Act conduct. *Hazelwood School District v. United States, supra*, 433 U.S. at 309 n. 15, 97 S.Ct. 2736 n. 15 (1977). "Proof that an employer engaged in racial discrimination prior to the effective date of Title VII might in some circumstances support the inference that such discrimination continued . . . ." *Id.* Moreover, defendants may be held liable if their post-Act conduct unlawfully perpetuates pre-Act discrimination. *Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *United States v. N.L. Industries, Inc.*, 479 F.2d 354, 360 (8th Cir. 1973); *United States v. Sheet Metal Workers Local 36*, 416 F.2d 123, 139 (8th Cir. 1969); *United States v. Central Motor Lines, Inc.*, 338 F.Supp. 532, 558–59 (W.D.N.C.1971), *appeal on other grounds dismissed sub nom. EEOC v. Central Motor Lines*, 537 F.2d 1162 (4th Cir. 1976).

Statistics showing gross disparities between the percentage of minority persons employed by a defendant and the percentage of minority persons in the relevant labor market have been held to establish *prima facie* proof of discrimination, *Hazelwood School District v. United States, supra*, 433 U.S. at 307–08, 97 S.Ct. 2736; *United States v. Fresno Unified School District*, 592 F.2d 1088, 1096 n. 5 (9th· Cir. 1979); *United States v. Ironworkers Local 86*, 443 F.2d 544, 551 & n. 21 (9th Cir.), *cert. denied* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971), particularly where supported by evidence of individual instances of discrimination. *International Brotherhood of Teamsters v. United States, supra*, 431 U.S. at 339, 97 S.Ct. 1843. "Statistics showing racial or ethnic imbalance are probative . . because such imbalance is often a telltale sign of purposeful discrimination . . ." *Id.* at 339–40 n. 20, 97 S.Ct. at 1856 n. 20.

## II.

■ The statistics in this case speak for themselves. Between 1965 and March 24, 1972, the City hired 85 firefighters, 84 of whom were white. Later in 1972, the City hired an additional 28 firefighters, all of whom were white. In 1975, when black and hispanic persons comprised approximately 41% of Bridgeport's labor force, its Fire Department had 427 whites, one hispanic, and no blacks.[3] In its entire history prior to 1975, the City had employed only two minority firefighters, one of whom had been hired in 1938. Since 1975, the City has hired an additional 84 firefighters, 81 of whom have been white.[4] As the Court of

---

**3.** The City has a one-year residency requirement for firefighter applicants, and is itself, therefore, the relevant labor market. *See EEOC v. Local 14, International Union of Operating Engineers*, 553 F.2d 251, 254 (2d Cir. 1977).

**4.** The 84 firefighters hired since 1975 were hired pursuant to a court-approved agreement among the parties. The parties agreed, in relevant part,

that the defendants may make at any time appointments to the Bridgeport Fire Department of a number of firefighters equal to one-half the number for which the city warrants there is and will remain an immediate

need and adequate funding. In the event the Court should order a hiring plan, these appointments will be counted as part of such plan.

The Court of Appeals suggested that this Court should "explicitly consider all the implications of" the hiring agreement. 594 F.2d at 312. The implications of the agreement seem clear. Plaintiffs agreed not to seek to enjoin defendants from hiring firefighters from the 1975 list, provided that defendants warranted that there was and would remain an immediate need and adequate funding for a number of firefighters equal to the number actually hired pursuant to the agreement. There is nothing to indicate that defendants agreed to quota relief, or that

Appeals noted with respect to the composition of the Fire Department in 1975, "[n]o manner of legal argument can justify th[ese] unpleasant fact[s]." 594 F.2d at 308.

The statistics in this case, while alone presenting compelling evidence of discrimination by the City, are not the only evidence of such discrimination. The evidence also establishes that in light of its reputation as a discriminatory employer the City has failed properly to recruit minority applicants for the Fire Department and has discriminated against minority individuals who have sought to apply for positions with the Fire Department.

Not surprisingly, the City's reputation as an employer has corresponded to the statistics above. By 1972, the City had established a reputation for employment discrimination against black and hispanic persons that was "by far the worst" of all cities in Connecticut. (Tr. at 733)[5] (testimony of Arthur Green, Connecticut Commission on Human Rights & Opportunities). This reputation created the attitude in the black community that "[i]f you're black, just don't apply because you won't get the job." (Tr. at 1963) (testimony of J. Michael Smith, District Director of Association for Bridgeport Community Development). In keeping with this reputation, the City never has made any significant efforts to remedy its situation by recruiting minority applicants for positions in the Fire Department.[6] Absolutely no attempts were made to recruit minority applicants for qualifying examinations prior to 1972. Despite the testimony of John Colligan, Personnel Assistant for the City of Bridgeport, that the City had a "very extensive recruitment program" of minority applicants for the 1975 exam (Tr. at 865), the credible evidence established that the City's recruitment efforts for that exam did not approach the dimensions of the "multi-media" campaign described by Colligan. (*Id.*)[7]

---

plaintiffs agreed that defendants would not be liable for back pay. This Court sees no reason to conclude either that the judicial approval of the hiring agreement operated to absolve defendants of any liability, or that defendants conceded by entering into the agreement that quota or any other type of relief would be appropriate.

5. Unless other dates are noted specifically, the transcript referred to (Tr.) is that of the trial on liability, spanning dates from October 28, 1977 to December 1, 1977.

6. The gross disparity between the minority percentage of the City's population and the minority percentage of the applicants for the firefighters tests in question supports the inference that defendants unlawfully have deterred minority persons from filing applications. Only 14.3% of the applicants who sat for the 1975 exam, for instance, were minority persons, compared to the 41% minority representation in the City's population. The disparity with regard to earlier examinations is even more dramatic. *See* n. 9, *infra*.

7. John Colligan, Personnel Assistant for the City of Bridgeport, testified that with regard to the 1975 exam, "[w]e had a very extensive recruitment program for the position of fire-fighter in the City of Bridgeport. . . . [I]t was what you would call a multi-media campaign." (Tr. at 865). He stated that newspaper ads were placed in the Bridgeport Post and Telegram and in "the local minority newspaper, the Harumbie Union . . .," *Id.*, and that radio ads were placed on minority-oriented programs on stations WICC, WNAB, and WLVH. He also indicated that the City "worked with virtually every minority community leader that we had contact with," (Tr. at 866), and "also had the assistance of the Bridgeport Guardian Association, which is a fraternal organization of black police officers, and they assisted us ably in the recruitment." *Id.* When asked specifically "who in the Bridgeport Guardian assisted you," Colligan stated that "Ted Meekins and Alerise Best both came to the Civil Service Office on several occasions and picked up applications." (Tr. at 954). When asked whether anyone else from the Guardians assisted, Colligan stated "[t]o my knowledge it was Ted Meekins and Alerise Best." *Id.*

The credible evidence established, however, that the City's recruitment efforts did not approach the dimensions of the "multi-media" campaign described by Colligan. William Abbott, Managing Director of WNAB Broadcast Center in Bridgeport, stated that no "paid" ad had been placed on the station for the 1975 test and that he was "almost . . . certain" that no "Public Service spots" had been used. (Tr. at 1950–51). Jose Grimald, President of WLVH in Hartford, testified that his station had no records of any advertising by the City of Bridgeport for the 1975 firefighters exam. Both Alerise Best and Theophilus (Ted) Meekins testified that they never had been asked to and never had participated in any way in re-

The only significant minority recruitment effort for the 1975 test was undertaken not by the City but by a coalition of community minority groups coordinated by Thomas Thompson, Director of the United States Labor Department Recruitment and Training Program in Bridgeport. The coalition was formed in 1973 "to try and establish some type of vehicle to assist minorities in gaining access to civil service jobs, particularly in the police and fire department." (Tr. at 46). When the coalition learned the 1975 exam would be given, its members "did on-the-street recruitment, both on the east end, west end, south end, all parts of town, by stopping individuals in pool rooms, bars, individuals walking down the street and asking them were they interested in taking the examination." (Tr. at 54). The coalition held community meetings to inform the minority community of the opportunity to take the firefighters test. Most significantly, the coalition held training sessions and provided instructors to prepare applicants for the test. These sessions were open to anyone, regardless of race, and were held three or four nights a week for three hours each night. Individual applicants attended these sessions for one to two months prior to the exam.

The City was fully aware of the coalition's recruitment efforts, but did little to assist the coalition and, in fact, partially impeded its effort. After the coalition had been formed, Thompson approached the then-Mayor, requesting that the City take action to recruit minority firefighters and offering the coalition's assistance in that effort. The Mayor apparently was receptive to this suggestion, and members of the coalition subsequently met with the City's Civil Service Personnel Director and representatives from the Fire Department. Ultimately, however, the City assisted the coalition in only two ways. First, the Civil Service Commission altered its apparently long-standing policy of requiring applicants to submit applications in person at the Commission's office in City Hall, and permitted the coalition to accept applications at the offices of the Association for Bridgeport Community Development (ABCD).[8] As will be discussed later, however, some problems developed relating to the processing of these applications. Second, the Personnel Director, Alan Cohen, provided the coalition with a "notice of examination" that outlined in a general way the subjects to be covered by the test. The notice contained the following language:

> Further, candidates must possess the following: mental alertness, mechanical aptitude, aptitude for increasing knowledge of the trade and for learning the variety of work performed by Fire Fighters; good knowledge of first aid and a working knowledge of the geography of the City of Bridgeport; ability to read and write understandingly [sic] the English language.

Based on Cohen's statement that the subjects mentioned in the notice would be covered on the test and that the coalition could use the notice as a guide to what would be on the test, the coalition focused its training program on these subjects. The coalition obtained a selection of tools used by firefighters and trained applicants in their use. Applicants were provided with maps of Bridgeport so that they could become familiar with its geography, and a first aid course was given.

The questions on the 1975 test, however, bore no resemblance to the questions anticipated by those who had gone through the coalition training program. There were no questions involving geography, first aid, or the use of firefighting equipment. Those who had been through the training program

---

cruitment for the 1975 firefighters exam. This evidence effectively destroyed any potential probative value of Colligan's testimony concerning an "extensive," "multi-media" recruitment effort by the City of Bridgeport.

**8.** Throughout the time period discussed in this opinion, the staff at the Civil Service Commis-

sion Office has been all white. By failing to employ minority persons in this office, the City, in effect, has placed "a sign reading 'Whites Only' on the hiring-office door, . . ." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 365, 97 S.Ct. 1843, 1870, 52 L.Ed.2d 396 (1977).

were thus potentially at a disadvantage, having been led to believe that they would be taking a test vastly different from the one placed before them. These applicants were disappointed and felt that "[t]he City has fooled us again." (Tr. at 161). Needless to say, the ultimate results of the 1975 test served only to strengthen the City's reputation as a discriminatory employer.

With the exception of these two rather ineffective and perhaps detrimental efforts to assist the coalition, the City did nothing to assist, endorse, publicize or otherwise associate itself with the coalition's recruitment effort.

The credible evidence also establishes that there were several instances of individual discrimination against minority applicants at the time of the 1975 test. Elias Castro is an hispanic person who has had four years' experience as a firefighter in the United States Air Force. Through an arrangement, mentioned earlier, between the Bridgeport Civil Service Commission and Thomas Thompson, Director of the United States Department of Labor Recruitment and Training Program for Bridgeport, Castro was allowed to and did file his application to become a firefighter at the offices of the Association for Bridgeport Community Development (ABCD). (The Civil Service Commission, prior to the 1975 exam, had required that all applications be filed at its office in City Hall.) Castro expected that his application would be forwarded by ABCD to the Civil Service Commission. On the last day for filing applications, Castro was informed that the Civil Service Commission did not have his application. He immediately went to the Civil Service Commission Office and attempted to file another application. Although it was still mid-afternoon on the last day for filing applications, Castro was told that it was "too late" for him to file another application. Castro unsuccessfully sought to speak to the superior of the person who had told him he could not file an application. Castro was not informed of any means by which he could appeal or officially complain of the refusal to accept his application. He did not take the 1975 firefighters exam.

Harmen Linares is an hispanic individual who filled out a timely application for the 1975 exam at the Civil Service Commission Office. He was told that he would receive notice in the mail of the date and time of the examination. Linares never received any notice, and later learned that he had missed the examination.

Ismael Pomales is an hispanic individual who took the 1975 examination and passed it but did not receive any notification that he had passed until he was informed by registered mail that his name was being removed from the list because he had not appeared for his scheduled physical agility examination. The registered letter he received did not indicate that he could take any steps to appeal the Commission's action in removing his name from the list.

Defendants also have discriminated against black and hispanic persons by using discriminatory firefighters qualifying tests. All of the firefighters qualifying examinations given by the City since 1965 have been discriminatory in that they have had a disparate impact on minorities and have not been job related. The City has admitted that all firefighters qualifying examinations given between 1965 and 1972 had a disparate impact on minorities and were not job related, and the evidence in the case supports this admission.[9] This Court found

---

9. Firefighters qualifying examinations were administered by the City in 1965, 1968, and 1971. The following table illustrates the racial composition of the applicant groups for each test:

| Year | Total Applicants | White | Black | Hispanic | Unknown |
|------|------|------|------|------|------|
| 1965 | 32 | 26 | 1 | 1 | 4 |
| 1968 | 75 | 59 | 3 | 1 | 12 |
| 1971 | 277 | 225 | 13 | 2 | 37 |

The following table illustrates the composite pass rate, by race, for all three tests combined:

| Race | All | White | Black | Hispanic | Unknown |
|------|------|------|------|------|------|
| # Of Applicants | 384 | 310 | 17 | 4 | 53 |
| # Passing | 113 | 112 | 0 | 1 | 0 |
| % Passing | 29.4% | 36.2% | 0% | 25% | 0% |

If the figures for black and hispanic applicants are combined, the composite passing percent-

in its previous opinion that the 1975 examination, the only one that has been administered since 1972, had a disparate impact on minorities and was not job related, *see Association Against Discrimination in Employment v. City of Bridgeport,* 454 F.Supp. 754, 758 (D.Conn.1978), and those findings are hereby reaffirmed and incorporated by reference herein. The Court now also finds that the disparate impact of the 1975 exam would not have been eliminated simply by reducing the passing score to 6.[10]

age ($\frac{1}{21}$) is 4.8%. If the assumption is made that all unknown applicants were white (this assumption tends to minimize disparate impact in this situation because all unknown applicants failed), the composite white passing rate (112/363) is reduced but only to 30.9%, a percentage still far exceeding the minority pass rate figure. These statistics appear to present a sample size large enough to be probative of discrimination, *United States v. San Diego County,* Civil No. 76–1094–S, Memorandum of Decision at 15 (S.D.Cal. July 6, 1979), particularly where the number of minority persons hired approaches "the inexorable zero." *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 342 n. 23, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

No effort ever had been made by the City to validate a firefighters test before the 1975 test. The pre-1975 tests were of a type held to be discriminatory in *Bridgeport Guardians, Inc. v Bridgeport Civil Service Commission,* 482 F.2d 1333 (2d Cir. 1973), *on remand.* Civil No. B–457 (D.Conn. Oct. 3, 1973), *aff'd* 497 F.2d 1113 (2d Cir. 1974), *cert. denied* 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975).

10. The Court of Appeals suggested in its decision that this Court consider on remand defendants' claim that lowering the passing score of the 1975 exam to 6 would eliminate disparate impact and thereby absolve defendants from liability in this case. The Court of Appeals wrote:

. . . We have found no authority on whether an employer who selects a cut-off score and defends it until the test has been found not job-related can then avoid the implications of that finding by adjusting the passing score to a point where the disparate impact is arguably insignificant.

594 F.2d at 313 n. 20. This Court finds that this intriguing issue is not before it because, first, simply lowering the passing score of the 1975 exam to 6 would not eliminate the exam's disparate impact, and, second, this Court now finds that defendants have engaged in a policy and practice of discrimination extending well beyond the 1975 exam.

A total of 771 individuals took the 1975 exam. All applicants now have been racially identified. The following table illustrates the passing rates of whites and minority persons at scores of 12 and 6:

| PASSING SCORE OF 12 | | | |
|---|---|---|---|
| | Total Tested | Passed | Failed | % Passing |
| White | 661 | 184 | 477 | 27.8 |
| Minority | 110 | 8 | 102 | 7.3 |
| PASSING SCORE OF 6 | | | |
| White | 661 | 448 | 213 | 67.8 |
| Minority | 110 | 59 | 51 | 53.6 |

A lowering of the passing score to 6, then, would reduce the disparity between white and minority pass rates from 20.5 percentage points to 14.2. Dr. John Peck, plaintiffs' expert, testified, however, that a difference of 14.2 would remain very highly significant. He calculated that the likelihood of this difference being attributable to chance would be less than five chances in one thousand.

Dr. Alan Gelfand, intervenors' expert, also testified that simply lowering the score to 6 would not eliminate disparate impact.

Even if lowering the score to 6 would eliminate disparate impact with respect to the absolute numbers of whites and minority persons passing, the disparate impact in terms of ranking would not be eliminated simply by lowering the score. The top 84 candidates on the list would have been hired, and 81 of them are white. The list would have a disparate impact on minority persons because whites would tend to be hired first. In fact, because 507 applicants scored 6 or higher on the test, and the Fire Department currently has only 121 vacancies, those who passed the test but who are on the lower end of the list probably would not be hired at all even if the passing score were reduced. (This remains true if the 84 who have been hired are taken into account; 423 applicants would remain to compete for 121 positions.) *See Vulcan Society v. Civil Service Commission,* 490 F.2d 387, 392 (2d Cir. 1973). Simply lowering the score to 6, then would not eliminate disparate impact.

Defendants and Intervenors have suggested that the Court should order some hiring plan that involves a lowering of the passing score to 6 and an elimination of the ranking system. They suggest the establishment of two pools of passing candidates, one white pool and one minority pool, from which candidates could be chosen at random pursuant to a formula that would ensure that the percentage of minority persons hired from the passing list would equal the percentage of minority persons who sat for the exam, thus eliminating disparate impact with respect to both absolute numbers and ranking. The result of such a Court-ordered plan, it is argued, would be a finding that defendants are not liable for discrimination with

### III.

■ Defendants have violated Title VII by failing properly to recruit minority applicants, thus perpetuating the deterrent effect of pre-Act discrimination. *Rogers v. International Paper Co.,* 510 F.2d 1340, 1345 (8th Cir.), *vacated* and *remanded on other grounds* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29, *modified* 526 F.2d 722 (8th Cir. 1975); *United States v. Sheet Metal Workers Local 36, supra,* 416 F.2d at 137–40; *United States v. Central Motor Lines, Inc., supra,* 338 F.Supp. at 558. *See Bridgeport Guardians v. Members of Bridgeport Civil Service Commission,* 482 F.2d 1333, 1340 (2d Cir.), *on remand on other grounds* Civil No. B–457 (D.Conn. Oct. 3, 1973), *aff'd* 497 F.2d 1113 (2d Cir. 1974), *cert. denied* 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975). Primary reliance on word-of-mouth recruitment is unlawful under the circumstances present here. *United States v. Georgia Power Co.,* 474 F.2d 906, 925–26 (5th Cir. 1973). *See also Franks v. Bowman Transportation Co.,* 495 F.2d 398, 418–19 (5th Cir. 1974), *reversed on other grounds,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Stamps v. Detroit Edison Co.,* 365 F.Supp. 87, 117 (E.D.Mich.1973), *aff'd in relevant part* 515 F.2d 301 (6th Cir. 1975), *vacated and remanded on other grounds* 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977).

Defendants also have violated Title VII by engaging in isolated acts of discrimination against individual applicants for firefighters' positions. *See International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 338 n. 19, 97 S.Ct. 1843.

■ Finally, defendants have violated Title VII by hiring firefighters since March 24, 1972 from lists generated by examinations that had disparate impacts on black and hispanic persons and were not job related. *See Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). Twenty-eight firefighters were hired in 1972 from a list generated by a 1971 exam. This post-Act hiring of firefighters violated Title VII even though the 1971 exam was administered before the Act became applicable to the City. *Guardians Association of New York City Police Department, Inc., v. Civil Service Commission,* 466 F.Supp. 1273, 1277 (S.D.N.Y.1979). An additional 84 firefighters were hired as a result of a 1975 exam that this Court has found to have been discriminatory. 454 F.Supp. at 758. Of the 112 firefighters hired since March 24, 1972, 109 have been white, while three have been black or hispanic.

---

respect to the 1975 exam. In view of its finding that the City has engaged in a continuing policy and practice of discriminating against black and hispanic persons, this Court perceives no need to address this novel contention. *See EEOC v. Local 638,* 532 F.2d 821, 826 (2d Cir. 1976).

The Court would note, however, that one serious problem with the approach suggested by defendants and defendants-intervenors is that it would involve Court-ordered hiring on the basis of an exam that is not job related. The Court, in its previous opinion, found serious deficiencies in the method of preparation and validation of the 1975 exam. The Court now also notes that in reaching its conclusion that there was a correlation between how well a firefighter performed on the 1975 test battery and how well that firefighter was rated by his superiors, Hay Associates used "out-of-range" and "blank" data. "Out-of-range" data are data indicating that an individual has received a score outside of the possible range of scores. Such data may be the result of clerical error. "Blank" data are data indicating that no score at all was received by certain individuals, per-

haps indicating that those individuals had not taken the test in question. The computer used by Hay interpreted these "blanks" as zeros. The use of these data in this case seriously altered the results of Hay's correlation calculations. Plaintiffs' expert, Dr. Peck, testified that if adjustments were made to compensate for this misuse of data, there would be no significant correlation between job performance and performance on the 1975 test, (Tr. at 2205). Hay's own validation data then, showed that "as far as test passing is concerned, it would be about as good a predictor [of job performance] as tossing a coin. . . ." (Tr. at 2219) (testimony of Dr. John Peck). Moreover, if adjustments are made for the misuse of "blank" scores, Hay's own validation data reveal that the FIT Mechanics test was significantly discriminatory against blacks. (Tr. at 2247–53). Dr. Peck testified that "someone who had followed appropriate statistical methodology and wished to eliminate tests with a disparate impact . . . ." would not have used the FIT Mechanics test as part of the 1975 firefighters test. (Tr. at 2256).

In summary, this Court finds that since March 24, 1972, defendants have violated Title VII by engaging in a policy and practice of discrimination against black and hispanic persons relative to entry-level hiring in the Bridgeport Fire Department.

*Title VI*

■ Title VI, which became effective July 2, 1964, prohibits discrimination in "any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (1970 ed. and Supp. V). It is now clear that a private right of action exists under Title VI, *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), and that the remedies that are available under Title VII also are available under Title VI. *Guardians Association of the New York City Police Department, Inc., v. Civil Service Commission of the City of New York*, supra at 1280–87 (S.D.N.Y.1979).

Defendants, in their answer, have admitted that federal funds have been received by the City and expended in the Fire Department. Plaintiffs have proven that such funds were received and expended in the Fire Department in each year between 1971 and 1977.

In 1971, the City administered a firefighters qualifying examination that had a disparate impact on black and hispanic applicants and that was not job related. The City made no efforts to recruit minority applicants for this test. In 1970, Thomas Thompson spoke to the then-Mayor [11] about the lack of minority firefighters in Bridgeport. Thompson suggested the establishment of an office of affirmative action to deal with minority hiring in the City, particularly in the Fire Department. Thompson explained that he was the director of a federal recruitment program and would be willing to undertake efforts to recruit minority applicants. Not only was Thompson never asked to help recruit for the 1971 exam, he was never informed that the test would be given. He learned of it only after it had been administered. Of the 72 people who passed the exam, 71 were white. All 72 were hired during 1971 and 1972.

■ In view of the City's long history of and reputation for discrimination against minorities with respect to employment in its Fire Department, its failure actively to recruit minorities for the 1971 test violated Title VI. *See Rogers v. International Paper Co., supra.* The City's failure to inform Thompson of its plans to administer the 1971 test is evidence that its failure to recruit minority applicants was purposeful. The test itself, as stated above, was discriminatory. For all of these reasons, and for the reasons stated earlier with respect to Title VII, this Court finds that since 1971, defendants have engaged in a continuing course of conduct in violation of Title VI by engaging in a policy and practice of discriminating against black and hispanic persons with regard to entry-level employment in the Bridgeport Fire Department.

*The Revenue Sharing Act*

■ The Revenue Sharing Act prohibits discrimination in programs and activities receiving revenue sharing funds. 31 U.S.C. § 1242(a) (1976 ed.). The Act expressly provides for private civil actions. 31 U.S.C. § 1244(a). *See also United States v. City of Chicago*, 395 F.Supp. 329, 342 n. 5 (N.D.Ill.), aff'd 525 F.2d 695 (7th Cir. 1975). Plaintiffs here appropriately have exhausted administrative remedies. *See* 31 U.S.C. § 1244(d)(2). The City of Bridgeport has received revenue sharing funds in each year beginning with 1973 and has expended a portion of them in the operation of its Fire Department. (Tr. at 784–786) (testimony of then-Comptroller John Norko). For the reasons stated with respect to Titles VI and VII, above, this Court finds that defendants, since January 1, 1973, have violated the Revenue Sharing Act by engaging in a policy and practice of discriminating against black and hispanic persons in regard to entry-level hiring in the Bridgeport Fire Department.

*Summary*

In summary, the Court finds that defendants, by engaging in a continuing policy and

---

11. The Mayor referred to here is not the same Mayor referred to in the text at p. 107, *supra*.

practice of discriminating against black and hispanic persons in regard to entry-level hiring in the Bridgeport Fire Department, have violated Title VI since January 1, 1971, Title VII since March 24, 1972, and the Revenue Sharing Act since January 1, 1973.

## REMEDY

*Titles VI & VII*

### I.

■ "Once a violation of Title VII is established, the district court possesses broad power as a court of equity to remedy the vestiges of past discriminatory practice," *Rios v. Enterprise Association Steamfitters Local 638*, 501 F.2d 622, 629 (2d Cir. 1974), and "to grant affirmative relief to combat the invidious and often subtle practices of discrimination." *United States v. Wood, Wire & Metal Lathers International Union, Local 46*, 471 F.2d 408, 413 (2d Cir.) *cert. denied* 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973). The purpose of the grant of broad remedial discretion is to permit the district court to fashion "the most complete relief possible" to "make whole" those who have been victims of unlawful discriminatory practices. *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). While recognizing that "any attempt to reconstruct what would have happened in the absence of discrimination is fraught with considerable difficulty," *Rios v. Enterprise Association Steamfitters Local 638, supra*, 501 F.2d at 632, and that "no remedy is perfect," *Kirkland v. New York State Department of Correctional Services*, 531 F.2d 5, 10 (2d Cir. 1975) (Mansfield, J., dissenting), *cert. denied* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976), *rehearing denied* 429 U.S. 1124, 97 S.Ct. 1162, 51 L.Ed.2d 574 (1977), the district court should make its best attempt to fashion a "fair measure of redress" for those who have been discriminated against "at no undue expense" to others. *Chance v. Board of Bar Examiners*, 534 F.2d 993, 1003 (2d Cir. 1976) (Oakes, J., dissenting), *cert. denied* 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060, *rehearing denied* 434 U.S. 881, 98 S.Ct. 243, 54 L.Ed.2d 164 (1977). The federal courts have "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Albermarle Paper Co. v. Moody, supra*, 422 U.S. at 418, 95 S.Ct. at 2372, *quoting Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965).

As noted earlier, the remedies available for Title VI violations are the same as those available for Title VII violations. *Guardians Association of New York City Police Department, Inc., v. Civil Service Commission of the City of New York, supra*. Defendants have violated Title VI since January 1, 1971 and Title VII since March 24, 1972. The Court's power under Titles VI or VII thus is limited to remedying discrimination that occurred after January 1, 1971. *Hazelwood School District v. United States, supra*, 433 U.S. at 309, n. 15, 97 S.Ct. 2736.

■ While aware that the imposition of race-conscious hiring orders should be approached in a "gingerly fashion," *Kirkland v. New York State Department of Correctional Services*, 520 F.2d 420, 427 (2d Cir.), *rehearing en banc denied* 531 F.2d 5 (2d Cir. 1975), *cert. denied* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976), *rehearing denied* 429 U.S. 1124, 97 S.Ct. 1162, 51 L.Ed.2d 574 (1977), and utilized only if necessary to redress "a clear-cut pattern of long-continued and egregious racial discrimination," *Association Against Discrimination in Employment v. City of Bridgeport, supra*, 594 F.2d at 310, *quoting Kirkland v. New York State Department of Correctional Services, supra*, 520 F.2d at 427, this Court concludes that it would be "shirking its duty to fashion an effective remedy were it not to order such relief here." *United States v. San Diego County*, Civil No. 76–1094–S. Memo. of Decision at 18 (S.D.Cal. July 6, 1979); *cf. Albermarle Paper Co. v. Moody, supra*. It is clear that the City of Bridgeport has engaged in a "clear-cut pattern of long-continued and egregious racial discrimination" with regard to hiring

in the Bridgeport Fire Department. This fact is apparent from a cursory examination of the statistical evidence in this case. Two-fifths of the residents of the City are minority persons, but the minority representation on the Fire Department approaches the "inexorable zero." *International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 342 n. 23, 97 S.Ct. 1843.

Other factors support the conclusion that the discrimination has been "egregious." These include the City's refusal actively to recruit minority persons, its failure to inform Thomas Thompson that the 1971 firefighters exam was to be given, its failure to comply with its own affirmative action plan,[12] its maintenance of an all-white Department of Civil Service throughout the period discussed in this opinion,[13] and its individual instances of discrimination against minority persons who actively sought to become firefighters. This Court also finds that the discrimination has been "long-continued" whether one examines the entire history of the City's hiring of firefighters or only its post-Act conduct.

A hiring order is particularly appropriate here because the City is a public employer and the Fire Department is a highly visible municipal uniformed service. *Bridgeport Guardians Inc., V. Members of Bridgeport Civil Service Commission, supra* 482 F.2d at

1341. At the remedy hearing before this Court on July 20, 1978, counsel for the City acknowledged that

> it is in the city's interest to have its minority citizens represented on its fire and police departments and every other department of the city, . . .. We— the city would accept gladly and willingly some adequate remedy that this Court might devise to make sure our minorities are—qualified minority citizens are on that department, and that would help us in reaching some of our affirmative action goals which in our competitive field we're handcuffed.

(Tr. at 100). Moreover, this Court is of the opinion that merely ordering nondiscriminatory hiring in the future, even coupled with the requirement that the City actively recruit minority candidates, would be inadequate either to remedy past discrimination or "to assure prospective minority candidates that applying is no longer futile." *Association Against Discrimination in Employment v. City of Bridgeport, supra,* 594 F.2d at 311 n. 13. "The effects of . . . past violation[s] of the minority's rights cannot be eliminated merely by prohibiting future discrimination, since this would be illusory and inadequate as a remedy. Affirmative action is essential." *Rios v. Enterprise Association Steamfitters Local 638, supra,* 501 F.2d at 631.[14]

---

**12.** In 1973, after the original decision in *Bridgeport Guardians v. Bridgeport Civil Service Commission, supra,* involving Bridgeport's Police Department, the City drafted an Affirmative Action Plan. The draft indicated that

> problems have resulted from the City's failure to modify its existing employment practices, which are extremely inflexible and insensitive to employment issues concerning protected classes. To date, the City has failed to take any aggressive action to comply with Equal Employment Opportunity Legislation.

(Ex. 55, p. 102). The Plan was not adopted until several years later when the City was forced to adopt an acceptable Plan or forego receipt of approximately $7 million in federal funds. (Tr. at 647, 1966). The statements in this Affirmative Action Plan indicate that for some time the City has been aware of its own discriminatory policies and reputation. The Plan itself indicates that in order to achieve reasonable minority representation among its "Public Safety" employees (a designation apparently encompassing almost exclusively firefighters), the City for three years should hire only black and hispanic persons for such positions. (Ex. 2, p. 111). Fewer minority persons will be hired pursuant to this Order (102) than the Affirmative Action Plan indicates should be hired in the "Public Safety" area (141). No voluntary efforts have been made by the City to comply with its own affirmative action goals for the Fire Department.

**13.** *See* n. 8, *supra.*

**14.** In its prior opinion, this Court indicated that "there appears to be no bad faith on the part of defendants in using the exam or selecting the respected management consulting firm of Hay to develop the exam." 454 F.Supp. at 757. Defendants and defendants-intervenors now argue that the imposition of a hiring order would

A hiring order should not be imposed if the reverse discriminatory effects of such an order "fall upon 'a small number of readily identifiable' non-minority persons." *Association Against Discrimination in Employment v. City of Bridgeport, supra,* 594 F.2d at 310, *quoting Kirkland v. New York State Department of Correctional Services, supra,* 520 F.2d at 429. In fashioning its hiring order, then, this Court begins with the proposition that none of the firefighters presently on the force should be "bumped" in order to make room for minority firefighters. *EEOC v. Local 638,* 532 F.2d 821, 830 (2d Cir. 1976), *on remand* No. 71 Civ. 2877 (S.D.N.Y. Jan. 19, 1977), *aff'd* 565 F.2d 31 (2d Cir. 1977). An order mandating the entry-level hiring of a specified number or ratio of minority persons, however, is a permissible means of remedying past discrimination because it is not possible readily to identify those non-minority persons who are being "kept out" by virtue of the order. *Cf. Patterson v. Newspaper & Mail Deliverers' Union,* 514 F.2d 767, 773–75 (2d Cir. 1975), *cert. denied* 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). "[A]n entry-level quota has a more diffuse and amorphous effect upon reverse discriminatees than a quota used to bump incumbents or hinder promotion of present members of the work force." *Id.* This Court, having made an explicit finding of past discrimination, *cf. Regents of University of California v. Bakke,* 438 U.S. 265, 300–301, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Fullilove v. Kreps,* 584 F.2d 600, 607 (2d Cir. 1978), *cert. granted,* 441 U.S. 960, 99 S.Ct. 2403, 60 L.Ed.2d 1064 (1979), concludes that no undue reverse discrimination would result from the imposition of an entry-level hiring order in this case. *Cf. Kaiser Aluminum & Chemical Corp. v. Weber,* —— U.S. ——, ——, 99 S.Ct. 2721, 61 L.Ed.2d 480, (1979), *Prate v. Freedman,* 583 F.2d 42, 46–47 (2d Cir. 1978).

The Second Circuit Court of Appeals has drawn a distinction between hiring "goals" and hiring "quotas." *See Rios v. Enterprise Association Steamfitters Local 638, supra,* 501 F.2d at 628 n. 3. A hiring goal lapses when a specified number or ratio is achieved, whereas a quota involves the relatively permanent use of a specified hiring ratio. *Id.* While it would appear that a finding of long-continued and egregious discrimination is a prerequisite to the imposition of either a goal or a quota, *Id.* at 631, this Court concludes that the imposition of a hiring goal should be approached somewhat less "gingerly" than the imposition of a quota. *Cf. Kirkland v. New York State Department of Correctional Services, supra,* 520 F.2d at 427. The imposition of a quota involves a relatively permanent intrusion into the hiring practices of an employer, whereas the imposition of a hiring goal may be, as it is in this case, the only effective means of remedying past discrimination. Accordingly, this Court will impose a hiring goal that will ensure that the minority composition of the total number of firefighters hired since January 1, 1971 (the date on which this Court has found that the City first violated Title VI) reasonably reflects the minority composition of the population of the relevant labor market, the City of Bridgeport. The imposition of a hiring goal of this magnitude, coupled with the requirement that the City actively recruit minority applicants and hire in a nondiscriminatory fashion once the goal is achieved, will be sufficient in this Court's opinion to "eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965). This Court, therefore, specifically declines to impose a hiring quota.

## II.

Since January 1, 1971, the City has hired 152 white, one hispanic, and three

---

be inconsistent with this prior finding of good faith. Good faith however, is not a defense to a charge of discrimination based on the use of discriminatory tests. *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). And while good faith may be a factor to be considered in fashioning a remedy, the prior finding of good faith did not apply to defendants' lack of recruitment of minority applicants or treatment of individual minority persons.

black firefighters. The hiring of an additional 102 minority persons would create a situation in which the percentage of minority firefighters hired since January 1, 1971 roughly would equal the percentage of minority persons in the population of the City.[15] In theory, these 102 positions should go to those minority individuals who would have been hired had there been no discrimination. Recognizing that, at this point in time, it is impossible to identify these individuals with any certainty, the Court must exercise its discretion to fashion an equitable means of selecting the individuals to be hired. *See Kirkland v. New York State Department of Correctional Services, supra,* 531 F.2d at 9 (Mansfield, J., dissenting).

As has been noted earlier, the firefighters examinations administered in 1971 and 1975 were not job related and, therefore, did not distinguish qualified applicants from those who were not qualified. Applicants with some college education tended to do less well on the 1975 exam than similar applicants without any college education. Those persons who have been hired from the 1975 list previously have been found by this Court to have performed well as firefighters, 454 F.Supp. at 759, and there is no evidence that those hired from the 1971 list have not similarly performed well. The Court finds, then, that those persons who can satisfy the requirements, other than passing an exam, that have been imposed on those who have been hired from the 1971 or 1975 lists are as qualified to become firefighters as those actually hired. Those minority applicants for the 1971 or 1975 tests who meet those qualifications but have not been offered employment have been victims of discrimination and should be offered employment as firefighters. If there are insufficient persons in the group described above to fill all 102 positions, the remainder should be filled, if possible, by persons who were deterred by the City's discriminatory practices from applying to take either the 1971 or the 1975 exam. While recognizing that the process of iden-

tifying this latter group of individuals may be complex administratively, the Court concludes that making the effort to identify these individuals is the best available means of ensuring that the benefits from this remedy order enure to individuals who have been the victims of the City's discriminatory practices. Moreover, procedures are available to ease the administrative burden.

▋ Back pay also is an appropriate remedy in this case. Awards of back pay "provide a spur to speed the elimination of discriminatory practices, and they give full compensation to the injured parties." *Stryker v. Register Publishing Co.,* 423 F.Supp. 476, 478 (D.Conn.1976). The Supreme Court has made clear that "given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albermarle Paper Co. v. Moody, supra,* 422 U.S. at 421, 95 S.Ct. at 2373. Accordingly, this Court will order that back pay be awarded to up to 102 individuals who can prove that they have been victims of the City's discriminatory policy and practice.

In accordance with the foregoing, the following hereby is Ordered:

A. *OLD EXAMS*

The test batteries given as written exams to firefighter candidates in 1971 and 1975 shall not again be used to test firefighter applicants.

B. *HIRING*

(1) The City promptly shall prepare a list of 102 minority persons to be offered positions as firefighters. This list shall include:

(a) The black and hispanic persons who filed applications for either the 1971 or 1975 test, who have not been offered but still seek employment with the Fire Department, and who pass both the agility

---

**15.** Evidence at the hearing on remand established that the City has an immediate need for 121 firefighters. There is ample room, then, for

the 102 whose hiring will be required by this opinion.

test and medical examination to be administered by the City. Said agility test and medical examination shall be given to these persons within 120 days of this order, shall be preceded by both published notice and individual written notice to each of those black and hispanic persons who filed applications for the 1971 or 1975 firefighters test, and shall be no more rigorous than those that have been administered to the firefighters hired since January 1, 1971.

(b) Sufficient additional minority persons chosen in accordance with this subparagraph to reach the total of 102 persons. The persons chosen under this subparagraph shall be individuals who prove to the special master that after January 1, 1971 they were deterred by the City's discriminatory practices from applying to take either the 1971 or 1975 test, and who pass both the agility test and medical examination to be administered by the City. The following procedure shall be used to identify these persons:

(i) The special master shall, in a manner he deems appropriate, publicize the fact that he will be accepting applications from minority persons who claim that after January 1, 1971 they were deterred by the City's discriminatory practices from filing applications for either the 1971 or 1975 firefighters test. The special master shall set and publicize a reasonable deadline for the submission of such applications.

(ii) The special master shall process the applications in a manner consistent with this opinion, and may hold hearings or other proceedings as he deems appropriate.

(iii) Each individual applicant shall bear the burden of proving by a preponderance of the evidence that he or she would have applied but for the City's discriminatory practices.

(iv) The special master need not process every application, but may choose among them at random until sufficient applications have been processed to complete the list of 102 minority persons to be offered employment.

(v) The agility test and medical examinations shall be administered to persons chosen by the special master at a time to be determined by the special master, and shall be preceded by written notice to the individuals to be tested and examined. The agility test and medical examination shall be no more rigorous than those that have been administered to the firefighters hired since January 1, 1971.

(c) If the procedures under subparagraphs (a) and (b) of this paragraph fail to produce sufficient individuals to fill the 102 places on the list, the City, subject to the Court's approval, promptly shall devise some other method for identifying additional minority persons to be placed on the list.

(2) Notwithstanding the above, the City shall not be obligated to place on the list the name of anyone who

(a) on or before the date of the exam for which he or she applied or would have applied but for the City's discrimination

(i) was not eighteen years of age;

(ii) had not graduated from high school or earned a high school equivalency certification;

(iii) did not possess a valid Connecticut driver's license; or

(iv) had not been a bona fide resident of Bridgeport for the past year; or

(b) does not possess a valid Connecticut driver's license on the date the name otherwise would be placed on the list, but

(c) nothing in this paragraph shall alter or limit the City's obligation ultimately to place 102 names on the list.

(3) As quickly as possible within the limits of the City's ability to train new firefighters, the City shall offer the 102 persons on the list active employment as firefighters and shall place those who accept on active duty. The City shall make a good faith effort to maximize its ability to train firefighters. No other individuals shall be hired as firefighters until all of the individ-

uals on the list have been offered active employment.[16]

(4) Subsequent appointments to the rank of firefighter shall be made in strict accordance with Titles VI and VII of the Civil Rights Act of 1964.

(5) The City actively shall recruit minority persons to compete for future vacancies in the Fire Department.

(6) This Court shall retain jurisdiction over this case until the provisions of this Order have been complied with.

## C. *SENIORITY*

 The City is prohibited from giving any promotional examinations to firefighters hired from lists generated by the 1971 or 1975 tests until such time as all the firefighters hired pursuant to B(1)(a) & (b) become qualified to take the promotional examinations.[17] Although the Court specifically is declining to alter the three-year time-in-grade requirement that now exists for firefighters who wish to take the promotional examination for the positions of Pump Engineer and Lieutenant, the Court is not opposed to a reduction of this require-

ment. The plausibility of reducing the time-in-grade requirement by establishing an improved training program for all firefighters involves a decision that must be left to the experienced judgment of the authorities in the Fire Department. Until such time as promotional examinations are administered, the City may fill promotional vacancies on an acting or provisional basis, except that acting or provisional supervisors shall not be given any preference in the selection of permanent supervisors. In selecting acting or provisional supervisors, the City is urged to take cognizance of the prior firefighting experience of a number of the plaintiffs.

## D. *BACK PAY*

(1) The City promptly shall generate a list of up to 102 persons to be awarded back pay. This list shall include:

(a) Each of the persons whose name is placed on the hiring list pursuant to B(1)(a) or (b).

(b) If fewer than 102 persons qualify under subparagraph (a) of this para-

---

**16.** The United States, as *amicus*, has suggested with some force that requiring the City to hire only minority persons until a specified goal is reached will have the unwanted effect of creating segregated training programs and a racially stratified work force within the Fire Department. The Government's suggested means of avoiding these undesirable consequences is to impose a 50% interim hiring goal that would lapse when the proportion of minority persons employed by the Fire Department reached some predetermined reasonable level. While this suggestion has obvious merit, the Court is reluctant to enter such an order because it could significantly increase defendants' "front pay" liability. In addition, a 50% interim goal would be unacceptable because it would not result in the hiring of enough minority persons soon enough. The Court would not be opposed, however, to some more realistic plan that would permit immediate integrated hiring while remaining otherwise consistent with the remedial goals sought to be achieved through this Order. Defendants are invited to submit such proposals as they deem appropriate.

**17.** The Supreme Court has held that "the denial of seniority relief to victims of illegal racial discrimination in hiring is permissible 'only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.'" *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 771, 96 S.Ct. 1251, 1267, 47 L.Ed.2d 444 (1976), *quoting Albermarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Seniority relief is appropriate in this case. The relief granted here will not result in anyone being "bumped", *EEOC v. Local 638*, 532 F.2d 821, 830 (2d Cir. 1976), *on remand* No. 71 Civ. 2877 (S.D.N.Y. Jan. 19, 1977). *See aff'd* 565 F.2d 31 (2d Cir. 1977), and those whose promotions may be delayed have been "the modest beneficiar[ies], vis-a-vis the minority work force, of a policy that discouraged minority persons" from obtaining employment on the Fire Department. *Patterson v. Newspaper & Mail Deliverers' Union*, 514 F.2d 767, 775 (2d Cir. 1975), *cert. denied* 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). The seniority relief granted here, then, will not have undue "reverse discrimination" effects. *Cf. Kaiser Aluminum & Chemical Corp. v. Weber*, —— U.S. ——, ——, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).

graph, additional minority persons chosen in accordance with this subparagraph up to a maximum of 102. Persons chosen in accordance with this subparagraph shall be minority persons who applied to take either the 1971 or 1975 exam whose names are not placed on the hiring list pursuant to B(1)(a) but who prove to the special master, by a preponderance of the evidence, that on the date of the exam for which they applied, they

(i) were eighteen years of age,

(ii) had graduated from high school or earned a high school equivalency certification,

(iii) possessed a valid Connecticut driver's license,

(iv) had been a bona fide resident of Bridgeport for the past year, and

(v) would have passed the agility test and medical examination administered to applicants who did pass one of the exams.

If fewer than 102 individuals qualify for back pay under subparagraph (a) of this paragraph, the special master shall notify each of the individuals potentially eligible for back pay under this subparagraph that they may file applications for back pay awards, and shall set a reasonable deadline for the filing of such applications. He need not process every application, but may choose among them at random until sufficient applications have been processed to fill the total of 102 places on the back pay list.

(c) If fewer than 102 individuals qualify under subparagraphs (a) and (b) of this paragraph, additional minority persons chosen in accordance with this subparagraph up to a maximum of 102. Persons chosen in accordance with this subparagraph shall be minority persons whose names are not placed on the hiring list pursuant to B(1)(b) but who prove to the special master by a preponderance of the evidence that but for the defendants' discriminatory practices they would have applied to take either the 1971 or 1975 exam, and that on the date of the exam for which they would have applied they

(i) were eighteen years of age,

(ii) had graduated from high school, or earned a high school equivalency certification,

(iii) possessed a valid Connecticut driver's license,

(iv) had been a bona fide resident of Bridgeport for the past year, and

(v) would have passed the agility test and medical examination administered to applicants who did pass one of the exams.

If fewer than 102 individuals qualify for back pay under subparagraphs (a) and (b) of this paragraph, the special master, in a manner he deems appropriate, shall publicize the fact that he will be accepting applications from individuals who claim to meet the requirements of this subparagraph, and shall set a reasonable deadline for the filing of such applications. He need not process every application, but may choose among them at random until sufficient applications have been processed to fill the total of 102 places on the back pay list.

(d) If fewer than 102 individuals qualify under subparagraphs (a), (b), & (c) of this paragraph, the remaining places on the back pay list shall remain vacant.

(2) Each of the persons whose name is placed on the back pay list shall be entitled to accumulated back pay at the time his or her name is placed on the list.

(3) For the purposes of this order, back pay shall include

(a) the sum of the value of all regular and overtime wages, fringe benefits, pension benefits, and all other benefits to which firefighters are or were entitled under union contracts, including all increments, together with interest and, for those individuals whose names are on the hiring list established pursuant to this order, "front pay" until the date the individual is offered active employment,

(b) reduced by the sum of amounts earned or earnable with reasonable diligence and amounts of any welfare or unemployment compensation received.

(4) The individuals whose names are on the list who either applied to take or were deterred by defendants' discriminatory practices from applying to take the 1971 test shall be awarded back pay from October, 1973 (two years prior to the filing of the first complaint with the EEOC).

(5) The individuals whose names are on the list who either applied to take or were deterred by defendants' discriminatory practices from applying to take the 1975 test shall be awarded back pay from October, 1976 (when the first firefighter was hired from the 1975 list).

(6) While considerations of back pay liability may not enter into determining whose names shall be placed on the list, the City may, if it chooses, offer active employment to those on the hiring list in an order that will minimize its liability for "front pay." It would seem to make sense in terms of both economics and social policy for the City to offer active employment first to those with the least present income.

### E. SPECIAL MASTER

The Court has had the good fortune to obtain the assistance of David S. Maclay, Esquire, of Westport, Connecticut, a member of the Bar of this Court, as a special master. The special master shall oversee the implementation of this Order. It shall be his duty to hear individual claims in order to determine those persons entitled to have their names placed on the lists, and to compute the back pay to which these persons may be entitled. The special master shall file a final report with this Court and may file such interim reports from time to time as he shall deem advisable. The special master shall be entitled to reasonable compensation by defendants for his services.

### F. COSTS AND ATTORNEYS' FEES

Plaintiffs hereby are granted their court costs and reasonable attorneys' fees to date.

The amount of such fees shall be set by the Court after a hearing to be scheduled in the future. Costs and attorneys' fees for work done in the future shall be fixed in such manner as the Court may determine is appropriate.

### The Revenue Sharing Act

The Revenue Sharing Act, 31 U.S.C. § 1242, confers upon this Court the power to order the suspension, termination, or repayment of revenue sharing funds when a governmental unit receiving such funds has been found to have discriminated in employment on the basis of race, color, or national origin. The Court reserves decision, pending compliance with this Order, as to whether to impose any remedy pursuant to this Act. As noted in its earlier decision, the Court views the termination of federal funding as a last resort. 454 F.Supp. at 753, *citing generally United States v. City of Chicago,* 549 F.2d 415, 449 (7th Cir. 1977).

### Conclusion

The Court finds that defendants have violated Titles VI and VII of the Civil Rights Act of 1964 and the Revenue Sharing Act. Judgment in accordance with this opinion shall enter for the plaintiffs on their complaint. Defendants' counterclaim and defendants-intervenors' cross-complaint are dismissed. Pending compliance with this judgment, the Court retains jurisdiction and reserves decision on whether to impose a remedy under the Revenue Sharing Act.

IT IS SO ORDERED.